Alright, our next case today is CSX Transportation Inc. v. Surface Transportation Board. Alright, we'll hear first from Mr. Adkins. May it please the Court. I'd like to begin with a quick summary of the state of negotiations between CSX and St. Pete. Thank you. You're very welcome. So last week, the Council approved the Mayor entering into an agreement to acquire the line. So that approval kicks off a three-month period where they will do an appraisal of the line and do some due diligence. During that time period, the City has the right and its sole discretion to withdraw from the agreement if they're not satisfied with the conditions of the line or if they can't secure some additional third-party funding for that agreement. What about CSX? Can CSX withdraw from the agreement? No, you don't. Okay. Not to my knowledge. So, although that's a non-final agreement and it doesn't really moot this appeal under this Court's precedent and other Court precedents largely dealing with settlements that occur while the case is on appeal, it does emphasize this Court's normal practice of resolving cases on the narrowest grounds possible. So when there's a procedural deficiency in the underlying decision, this Court will routinely go past and set the statutory issue aside for a later day and address the procedural questions. So with that in mind and given the context of these ongoing negotiations, my intent is to start with the notice. When will we – you said three months. So in three months, will we know if the deal is finalized? Correct, Your Honor. It might not moot the appeal, but we could stay the proceedings. Absolutely, Your Honor. So CSX would have no objections to your staying these proceedings while that is ongoing. I think we've asked this Court to stay it in the past, and you only gave us two stays and not a third. And it would be about four months. It could take longer. Everything, as you know, is a negotiation. So if something comes up, there's nothing that would prevent the parties from extending the period of time for the due diligence or the like. But yes, Your Honor, the target is about four months, and I believe the need to enforce St. Pete extends until August. So if you were to stay this proceeding for that duration, CSX would have no objection. But turning to the question of notice, so I'll start with notice because the law in this area is pretty clear. It's just a question of the application of these facts. So under the law, under the APA, CSX and GHL were entitled to a decision by the agency in writing of the facts and conduct that might justify revocation of the need to, the license, and then an opportunity to either conform their behavior to that new decision by the agency. So a lot of courts have referred to this as kind of a second chance. It's designed to give a license holder a second chance to conform themselves to their behavior to what the agency believes is appropriate before you get the extra. Why was the notice that the DOJ letter comes in. Yes. The board sends out a notice to CSX and says you have an opportunity to respond to what we've learned in the DOJ letter. Why is that notice not sufficient? So I would say for two reasons. First, Your Honor, the notice has to come from the agency, not from comments of the parties. It did. It came from the board. They can attach, I don't see why, I could understand simply the DOJ letter is not notice in and of itself, but why if the board says we're concerned about DOJ letter and they attach it to their notice as Exhibit A, why is that not now the board's notice? So I would say, Your Honor, it's because it really doesn't lay out in there what it is that the board is proposing to do. So if you look at the notice itself. Does the notice under case law require that the license holder be apprised precisely of what action the agency will take? Not precisely, Your Honor, but I believe there is at least a requirement that the parties have some belief or be placed at least on notice that their conduct is going to call into question the continuing license. You don't think that the DOJ letter calls into question that conduct? Not given the case law that existed. Then why would your responses to it then suggest that board precedents didn't require a showing that the Trails Act, or didn't allow for a showing that the Trails Act did not apply? Well, yes, Your Honor. We were responding to subsequent comments by the applicants, DOJ, and the amicus that says. Right. How would this have changed? How are you prejudiced then because you made all of your arguments? But there's two parts to the notice requirement. It's not only an opportunity to see the conduct, but an opportunity to conform your behavior to it. So if there was now a new requirement that we had to put a trail in place in a certain period of time, which had never existed prior to this, we have to be given an opportunity to conform ourselves to that new requirement. I guess I don't understand the board's position as being you have to put a trail in place within a certain period. As I understand the decision, it seems to me that they were saying, we do not think you have a bona fide intent to ever put a trail in place. Not that you haven't done it within a specified period. And we don't think that you have an intent to ever put a trail in place because, for example, year after year you keep leasing the space to Fregs and pulling in $45,000 a year on that. And you're leasing it directly, not even through GHL. And a bunch of other factors as well. So why, given that you centered your arguments on the fact that the board didn't have the right to determine whether you were going to use this for a trail or not, why doesn't that suffice? Suffice to give us the notice, Your Honor, and the opportunity to conform? Because if that's their intent, we could conform to that behavior by giving them the necessary assertion, but also engaging in the negotiations with St. Pete in order to create the trail. Or in the alternative, if they wanted GHL to allow bird watchers on the property, as one of their suggestions, or do something else to open up the property, GHL, had they known that was a requirement, they could have done so. But you can, I don't think that you could conform to their requirements if their point is you never intended to make a trail. You can't go back and intend to make a trail, right? You're right, Your Honor. We couldn't go back in time. But let me make two points. First of all, I really genuinely disagree with that, that that is the holding of the STB, that GHL never intended to put this into a trail. Because GHL, it's been established, TSX has been very transparent about the use of GHL, and it has been very successful in creating trails in the past. All that happened here is it was taking too long. So they said, you have done nothing to date to make this a trail, and that's a violation of the Trails Act. And there are cases, if you're only going to read one case that I think favors our position, Your Honors, take a look at the Wheeling case of the STB. So this is a case where they gave the trail to somebody who was a salvage company. That's what the company does for a living. It salvages line. That company came in and salvaged the line, and then for 18 years, they never set up a trail. And local landowners came in and said, I'm sorry, that's a violation of the Trails Act if you spent 18 years with this property and you've never set up a trail. And the STB uniformly rejected that argument. And what it said was, and the quote is, the Trails Act does not require that a trail be developed in any particular way and that there is no time limit for how quickly a trail must be developed to its intended level of use. Right, but that's, you're arguing the basic issue again, which is, I mean, do you concede that if the Surface Transportation Board concludes that an entity has no bona fide intent to ever set up a trail, that it can remove an NITU, it can revoke it? So we, okay, so we'd have to look at the statute to say, where's their authority to do that? Okay, so your answer is no, you don't agree. The only way they would be able to Can you answer that though first? Yes, okay. Yes, I believe that they have the authority to do that, but not under any of the provisions that they've cited or that they cited in that decision. So if you look at the Trails Act, there's only one provision that gives them this authority, which is the applicant needs to be qualified. Once you're qualified, you'll be I guess I disagree with that when you look at the statutory language. The statutory language in two places, and in fact, even in the same sentence that you are now quoting, talks about that it has to be for a use that is not inconsistent with the purposes of the Act, the Rails Act, right? I mean, that's what it says. I can read that to you if you want. Yes, I see it, Your Honor. So why doesn't that require the Surface Transportation Board to ensure that the use is in fact consistent with the purposes of the Act? So that term and the one that follows it has been interpreted as requiring only two things to be consistent with the Act. One is that the trail sponsor is taking responsibility, and the second one is that they agree to bank it. So I guess I disagree with that too. First of all, and maybe I should ask you, what are you relying on for that? Because if you're relying on agency decisions No, no, I'm relying on the D.C. Circuit and the Eighth Circuit's press suite, Your Honor, which look to see whether or not the agency has any discretion, any discretion at all, besides making those two findings and whether they'll set up a trail. Because if they have any discretion at all in this statute, they have to do an environmental Let's say that the qualifications are met at the time that the notice is issued, and then a week later the GHL equivalent decides, you know what, actually I have no interest in making a trail, and the railroad says, yeah, me neither. Is there at that point anything in your view that the agency can do? Yes, it's never happened, and I don't think it happened here, but I do believe that they could say that you are no longer qualified to be a trail sponsor, and that would revoke. So if you look at their role here, I think there's two ministerial roles, and I do think they're ministerial. So why doesn't that mean that you lose? Because if the agency has the authority to say, you've admitted that you have no intent to ever set up a trail, why can't it also say, we find that you have no intent to ever set up a trail, and so we're going to revoke. But that's not what they held, Your Honor. They did not say that we were unqualified, and they did not say that we will never set it up. I feel like you're just sort of playing semantics games here. But I think they're important semantics, Your Honor, because what's the line between them not regulating the trail at all, and them not saying, I'm going to decide how long, I'm going to decide what kind of dual use you're going to use, I'm going to decide whether you have to open it up for bird watchers. I hope you agree with me that they don't get to regulate the trail. They don't get to regulate the use. That statement I made about it does not— But, you know, just because they have an opportunity to determine whether or not it's consistent with the Rails Act, right, doesn't mean that they have discretion to decide how it's used or whatever, other than that it's consistent. It's like a ministerial kind of thing to determine. It's consistent with its use. Respectfully, Your Honor, I disagree. If you all don't agree with me, I get it. But that is regulation. If you say, I think it's inconsistent with the use because you don't put bathrooms on it, how is that not regulating? If I say it's not inconsistent— Because it's not the Bathrooms Trails Conservancy Act. It's the trails. So, again, but it comes to the time which they took. If we had put a trail in this place by the time this decision had occurred, there'd be no grounds. So it really was about the timing of how long it took them to negotiate with St. Pete for a trail. It's all about timing, Your Honors. And that's regulation. That's a question that I have. Why is the question about negotiating with St. Pete for a trail? I mean, the sponsor is GHL. St. Pete wanted to be the sponsor, and CSX wouldn't accept that. So why are we now saying, well, we need to negotiate with St. Pete? If CSX was so interested in negotiating with St. Pete, then why wasn't that the sponsor that it selected? Well, originally it didn't select it because of the monetary amount of money that St. Pete was offering they thought was inadequate, and they thought this was an alternative vehicle to create a trail. Well, right, but as I understand it, the Trails Act isn't an option for a railroad to sell its right-of-way for a trail. It's providing for it to avoid abandonment by reaching an agreement with another party to produce a trail. Did I miss something on that? Yes, Your Honor, because the entirety of it is voluntary, and some of this line is owned by CSX. So if two people come to CSX and say, we'd like to be trail sponsors, it is completely within our sole discretion to decide which of the two of them we're going to pick. The entirety of the Trails Act is a voluntary effort to encourage railroads to put these lines into banking to preserve the corridors for future rail service. So I do think it's completely legitimate for CSX to say, this sponsor, we prefer not to engage with at this time. We prefer GHL. Is it typical? I'm not sure that this is what the statute envisions, but is it typical in practice for these rights to be sold? Yes, Your Honor. And one thing that's troubled me is the fact that this agreement seems to set up that CSX obviously still gets the rent from a sports bar, right, which does not really suggest the prospect of a trail. Maybe I'm wrong about that. Do you think that the idea is to have a trail through the middle of the sports bar? Yes, Your Honor. The sports bar is off to one side. There's ample room to get past it. It actually makes it an encouraging part of the trail is you've got the stadium on one side, you've got a sports bar on the other. So it makes the trail more attractive to the public. It's not unusual for there to be dual use. And, again, this goes back to agency precedent and my point about notice, which is the agency precedent has said quite clearly you can have dual use, and CSX relied on that precedent, and then it was told with this decision that that was inappropriate and shouldn't have happened. If they had known that in advance, Your Honors, much like the timing of the trail, the lease could be revoked by CSX at any point in time. So if abandonment of this easement, which I think is what St. Pete originally requested, right, if abandonment had occurred, then the taxpayers of the United States would not have been obligated to pay $18 million to, I believe, primarily the sports bar, but also a few other parties, right? That's correct. I realize that that's not directly involved in this case, but how is this scheme working here in any way to both produce a trail or any value for taxpayers as opposed to CSX and a sports bar? Well, but for this statute, the line would be abandoned and there would be no contiguous, and there would be no ability to reactivate the trail for future rail service. The absolute core of the Trails Act in 1983 was railroads were divesting lots of track and there was a concern that we were losing these important national assets. These quarters could not be put back in place once they were abandoned. And so that's what the Trails Act is designed to do. The STV has said that that's its primary concern once it approves a need to, is to make sure that nobody has done anything that imperils the ability to reinstate freight rail service, which CSX has not done, which GHL had not done. It was just taking time to negotiate an agreement, and under the Wheeling precedent, Your Honour, 18 years was not considered to be too long a period of time to satisfy the Trails Act. Why is 1.5 enough time? All right. Thank you very much, Mr. Atkins. You have reserved five minutes for rebuttal. Thank you very much, Your Honour. We'll hear next from Mr. Kress. May it please the Court. Adam Kress for the Federal Respondents. Per the Trails Act's express language, it is the use of a line as a trail that prevents abandonment. It cannot seriously be maintained that the Board is powerless to revoke a need to using its statutory reopening authority, where it's become apparent that a rail bank line will not be used for trail purposes. What's your response quickly to the 18-year precedent that your friend on the other side has cited? I think the Board has long held that there is no time limit for establishing trail use. There's no set deadline. And I don't think this decision and the revocation decision the Board did not revoke the need to because a trail had not been implemented within a certain period of time. It revoked the need to because CSXT and GHL had done nothing to make the line even available to the public for use as a trail, had no plan for trail use, had no explanation for their inactivity, had basically taken the position before the Board and the Court that they have no obligation to implement trail use. And this was in a case where this case arose because there was a real trail sponsor that was interested in acquiring a line for trail use, the City of St. Petersburg. CSXT told the Board, this is at appendix page 105, it said that the City's efforts to acquire the line through the adverse abandonment proceeding, it initiated a proceeding with the Board to acquire the line through adverse abandonment, that that proceeding forced its hand. So it initiated rail banking procedures with its own subsidiary. And that's fine. And it's fine for CSXT and GHL to have done that. But they have to actually be sincere about using the line as a trail. So it was for all of these reasons that the Board found that there was misuse of the Trails Act. It wasn't just because there was not use within a certain period of time. It still is not setting a deadline for trail use. So you sent the notice out. The notice is being challenged by opposing counsel that the Board's notice did not alert CSX that there was a risk of revocation. How do you address that argument? I think, Judge Branch, as you identified, the Board, the DOJ letter set forth the factual allegations, many of them that led to revocation. It said that the line wasn't being used as a trail. There was no plans used as a trail. There was no present intention. And it specifically said that this calls into question the applicability of the Trails Act. The Board took that letter, and it said, directed CSXT and GHL to respond to it. And it required that they also explain at a minimum whether and if so the line is being used as a trail. CSXT seems to want to create this rule under 558C that the agency has, it can't incorporate any other documents by reference in its notices. It has to kind of retype them out itself. It doesn't make any sense, as Judge Rosenbaum noted, that in any due process case, there has to be a showing of substantial prejudice. And on all of CSXT's notice arguments, where is the prejudice here? They talk about needing an opportunity to cure. What would they do differently? Their argument is that they have no obligation to implement trail use. And, by the way, they had two opportunities to make all their arguments before the Board, and they took those opportunities. As a quick aside, opposing counsel said CSX has no objection to staying proceedings pending the resolution of the agreement with the city below. What's your position on that? The Board's position is that if CSXT and the city reach an interim trail use agreement, a final agreement, that would move this appeal. So that could be a stay. For that reason, we wouldn't have an objection to that. In fairness to Mr. Atkins, he said that if you had specifically said, we're going to revoke, that they would have then had an opportunity to maybe have a second chance, I guess, to come into compliance. And what is your response to that? The Board, in that notice, also directed parties to respond to the filing by CSXT. And in those replies, it was Rails to Trails Conservancy that specifically mentioned revocation. Department of Justice, in its response, specifically cited the 1987 rulemaking where the Board said it could revisit MeToos if there were questions raised about applicability, including that the line would not be used as a trail. CSXT then responded to that, to those filings, and took the position that it's taking now before the court that there just really is no obligation. It actually didn't respond to the 1987 rulemaking. It didn't say anything about it until its reply brief. You're not suggesting, though, that a commenter can provide sufficient notice under the APA to CSX? I'm saying that they knew what the consequences were based on the filings. Are you leaning really heavily on the commenters? I'm leaning on the fact that it was apparent from their final filing before the Board that they knew revocation was on the table. They specifically asked the Board not to revoke, and that there's just no showing of prejudice in this matter. So you're saying if they asked the Board not to revoke, then that's kind of prima facie evidence that they had notice that the Board could or would? I think it is evidence that they knew that that revocation was on the table. I mean, even in the DOJ's first letter, it had specifically stated that the conduct by CSXT had raised questions about the applicability of the Trails Act. Well, in the DOJ letter, it was incorporated into the Board's notice, at least as far as I'm concerned. You attached it and said this is a concern, respond to it. That's correct. I guess what I'm trying to get at is, are you saying your notice was sufficient under the APA, or are you saying, well, the commenters gave enough notice to CSX? I'm saying two things, Your Honor. I'm saying that the Board's notice was sufficient under the APA, and then separately I'm saying that to the extent it wasn't, there's no showing of prejudice here because CSXT clearly knew that revocation was on the table, and it didn't change any of its arguments. It's consistently argued that trail use is not a requirement of the Trails Act. So what's your response to CSX's contention that the only responsibility that the Board has and indeed can have is to determine that the sponsor is willing to assume financial responsibility, full responsibility for the management of and for any legal liability arising out of the transfer of the right-of-way? Do you think that the Board's authority is so limited? No, Your Honor. I think that argument is atextual. The Trails Act itself refers repeatedly to use of the line as a trail. As we argued, that's really the operative clause that prevents abandonment, and it also, as Your Honor's February 2nd order identified, it is what forbids the Board from permitting abandonment. And the Board can't really measure its own obligations under the Trails Act if it can't assess whether it's being applied properly in the first instance, as the agency has said since the late 1980s. And you have separate statutory authority to reopen proceeding, correct? That's correct, Your Honor. 49 U.S.C. 1322. Again, this is decidedly not our question, but I'm just curious. Do you know if anyone has challenged the, I think, agreed-upon eminent domain precedent that somehow conversion of a piece of land from being a railway, which is presumably not usable for the owner, to being a trail, which is equally not usable to the owner, is somehow a government taking a property? That— Not our issue. I'm just curious what the kind of current thinking on that is. I will just say that I found the eminent domain proceedings very surprising. Well, yes, Your Honor, and it has been well-established that there can be a liability for the United States where a railroad has an easement that's limited for railroad purposes, and the Trails Act results in interim trail use agreement. Right, so you just—I mean, obviously it is settled, but you see it as completely settled. It's not even anything that's under consideration that you know. The issue before the Supreme Court in the Perezzo decision in 1990 was whether this was— whether the use of the Trails Act in that circumstance that Justice Scribe was an unconstitutional taking, and the Supreme Court said it was not because the Tucker Act remains—is a valid remedy. So I think that issue is settled, Your Honor, but— Just curious. Sure. Do you think that—do you think that it's—do you agree that it's common for financial negotiations to occur between railroads and potential Trail Act sponsors? I understand that there are several past cases where that's taken place, including between CSXT and GHL. There weren't challenges raised in those cases. Counsel— Just as a matter of practice, do you think that that—is it your understanding that that's a typical practice? I don't know how typical it is, Your Honor. I know it occurs, and generally in administering the Trails Act, the board presumes the legitimacy of any rail banking request. That facilitates—it presumes that legitimacy. But that legitimacy can be called into question after the fact, and that's the case with respect to the fitness requirements, the requirements that the trail sponsor assume responsibility for the right-of-way, and it's also the case with respect to the rail banking requirement, the requirement that the line be subject to restoration for rail service. So even though the board presumes that those requirements are met, once the trail sponsor submits its statement of willingness, its verification, if you will, they can be revisited later, and that's analogous to what happened in this case with respect to trail use. Thank you. Your Honors, I would just say that really the real issue in this case is whether the board acted reasonably in revoking the MeToo based on the facts presented. The revocation decision was thorough and well-reasoned. If Your Honors have no further questions, respondents respectfully request that the court deny the petition for review. All right. Thank you very much. We'll hear next from the Rails to Trails Conservancy. If it please the court, my name is Charles Montang. I am here on behalf of Rails to Trails Conservancy, a nonprofit organization formed in 1985 and 86 in order to facilitate the creation of rail trails on otherwise to be abandoned railroad rights-of-way and especially to foster use of Section 80 of the Trails Act, which is the statute fundamentally at issue here. We're very concerned about this. I'm the first general counsel for the agency, for the Rails to Trails Conservancy, not the agency, for the Rails to Trails Conservancy, and my presence here is to underscore the importance we attach to this case. I would like to begin by noting that the notion that 8D, Trails Act, is ministerial is a kind of misuse, as the Surface Transportation Board has indicated in that term. The longstanding STB and ICC precedent is that where there's no overriding federal interest in interstate commerce, we will not allow our jurisdiction to shield a railroad or any party seeking relief before us from the legitimate processes of state law. That's in STB's decision in docket AB 290, North Fork and Western Railway, sub number 184, back in May of 1990. Although, in fairness, if the land is being maintained for a railroad to be put back into place at a later time, it seems like that would... They can use a discontinuance authorization to do that. In this particular case, the federal interest is either rail use or, under the Trails Act, trail use. Here, they're not doing either. If they wanted to keep this for their future use, all they have to do is a discontinuance. Why didn't they do that? Because this had not been used for almost two decades or even three, and there was a lucrative business that they were charging rent to, businesses, a fourth right-of-way. There was never going to be a trail that they put in there. They were going to collect rent, and they like to collect rent. So how do you do that? You keep your rail license in place. St. Petersburg challenged that with an adverse abandonment proceeding. Why did they do that? You have to get an adverse abandonment authorization in order to exercise state law eminent domain. St. Petersburg was threatening state law eminent domain against the railroad. They had to get the railroad, the SCB jurisdiction, lifted in order to do that. CSX responded with what we viewed as a ruse. We, Rails-to-Trails Conservancy, viewed as a ruse. They filed a notice of exemption to abandon the railroad, then converted that into a trail use, a NITU, which had the effect of allowing them to continue to charge rent, block the St. Petersburg from use of its own property, and block the eminent domain proceeding. It was a ruse. And under STB's exemption statute, 49 U.S.C. 10502 D, the agency has always maintained that revocation, that they can revoke a railroad license granted under the exemption statute whenever revocation is necessary to ensure the integrity of the board's processes. Here, that's exactly what happened. That's what we said to them. Thank you, Mr. Armantang. We appreciate your argument. Mr. Atkins, you have reserved five minutes. Thank you, Your Honors. I'd like to come back and just touch on two points. One is your belief that the board ruled that CSX and GSL were never going to put the trail in. That was the core of their finding, and I disagree with it. I'd like to just walk you through the decision. I don't think that's the holding of the STB. And then just touch on notice real quickly and then end. I should start by saying I agree that it's inartfully worded, but I think when you read the whole gist of the opinion, that's really the only conclusion you can fairly come away with. So let me just reference you to the penultimate paragraph of their decision, which really lays out it's all about timing. So they said, after resetting the facts and discretion, said CSX and GSL have ample opportunity to properly rail bank the line under the Trails Act. The totality of the circumstances, their unexplained failure to make the line available to the public. It's all about the timing, Your Honor. And then there's concerns about the sports bar. But it's about the timing. There's nothing in this decision that suggests they made a finding that GHL and CSX were never going to put the line in place. I don't think you can say under your breath, and also there's the sports bar. Okay, I didn't mean to underplay it. The sports bar was an important part. But there's two lines of agency precedent that permit both of those things to take place. One is the Wheeling case that says you can take as long as you like to put the trail in effect. And the other one is another line of precedent referenced by the dissent that says dual use is fine so long as the dual use does not interfere with the ability to create a trail or to rail bank, which was the case here. And my last point, Your Honor. Let me ask you a question, though, about that, if you don't mind. Sure. So if we understood this decision to mean that the board was finding that there was no bona fide intent by CSX to ever put a trail there, then what is your position? I mean, assuming for purposes of the question, taking that as a granted. If they made that finding, and were that finding supported by substantial evidence in the record below, then I do believe they could say that GHL was unqualified and consider reopening the proceeding and revoking the need to. So if there were some evidence, if we had put a bowling alley on the property, if there was some concrete evidence, substantial evidence to support a finding that you said that they never intend in the future, because there is no timetable on this. There's no limit. So as long as you're working to try to create a trail, that's sufficient per the Wheeler case. Eighteen years. As long as you're working to try to create a trail. Yes. And most importantly, Your Honor, so long as you haven't done anything that makes it impossible to put a trail in effect. So if you've put a bowling alley in, or if you've done something with the property that makes it so you can't put either a trail or rail bank, that would be pretty good evidence. Didn't they give you an opportunity to explain what you were doing to work to try to put a trail in? Again, coming back to the same, my main point, though, Your Honor, is that there's nothing in this decision that suggests the board made the finding that you're suggesting would give them the authority to revoke. What evidence is there that CSX and GHL were working toward putting a trail there? The letter that the party submitted into the record, that was ignored by the board and picked up by both dissents, that they were engaged in negotiations with the city of St. Pete. So they said that they're engaged with the city of St. Pete, which could also suggest, I'm not saying that the board made this conclusion, but it could also suggest that CSX and GHL did not intend to work together to make a trail, that CSX instead intended to delay and extend, to give itself an opportunity to extend its negotiation process with St. Pete so that it could get more money for a trail rather than negotiating directly with St. Pete in the first place. I guess there's lots of findings that the board could have made that they didn't make, Your Honor. The fact is, you asked me, what's the evidence? GHL was in negotiations with the city. The city actually authorized the submission of that letter and itself said, you should leave a need to in place in order to facilitate the creation of a trail. There's nothing inconsistent with the statute with having somebody like GHL whose role is a placeholder. They are created, their entire existence is about creating trails and promulgating that use. So I really want to come back to that point, Your Honor, about what was it the board held. It was about timing, but that is fundamentally inconsistent with their precedent. And let me just end on the notice point, because if it really was just about you had ample opportunity and that you could have somehow made it available, we need to be put on notice. And I'm going to end with the words of the current chairman of the STB who dissented from this case. And he wrote, the board has said little since the parties concluded their negotiations in 2021, only placing a letter from DOJ in the docket and ordering a response with essentially no explanation of the board's contemplated action or its associated reasoning. That's the current chair of the STB who dissented from this case because we were not given adequate notice about what it was that the board was holding us to in light of decades of precedent that said, we can take our time to create the trail. So I understand that he is now the current chair of the STB, but there is a footnote in the STB's brief that says the STB authorized the filing of its brief, but without the permission of the dissenters, which I guess would include the chair, right? It actually includes the majority of the board, Your Honor, so I'm not exactly sure. So the majority of the board approved the filing of the brief? At the time, I think the answer is yes. The point I'm making is the two dissenters are currently the majority of the board. There's three members of the board, two of them currently dissented from this decision. But really the point I'm making is the people who are best situated to say, were we really giving sufficient guidance to the parties about what it was we were contemplating doing? Did we really give them adequate notice? Were the members themselves and the chairman laid bare that there was no notice given to the parties in light of the longstanding precedent that said— I just want to go back to this footnote for a second. So the footnote concedes that the membership of the board has changed, but nonetheless, the majority of the board approved the filing of the brief. That's my understanding. I have nothing further to add. That's correct, and at the time of filing the brief, there were four board members, two dissenters. Oh, and now there's another board member. No, now there's one fewer. Yes, and at that time, the majority of the board approved the filing. And still approves the tax deductions. I've gone way over on my time. Thank you very much for considering the matter, Your Honors. Thank you, Counsel.